**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| TRANSPORTATION ALLIANCE BANK, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 10-CV-16-GKF-PJC |
| ARROW TRUCKING CO., PIEL CORP., MEGAN CORP., ARROW TRUCK REAL ESTATE CO., CAROL PIELSTICKER, JAMES DOUGLAS PIELSTICKER, JONATHAN MOORE, and JOSEPH MOWRY, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the court is defendant Carol Pielsticker Bump's Motion to Dismiss Claims 12, 13, 14 and 16 for Lack of Subject Matter Jurisdiction [Doc. No. 82].

This lawsuit arises from the financial collapse of Arrow Trucking Co. ("Arrow"). Arrow and plaintiff, Transportation Alliance Bank, Inc. ("TAB"), a Utah industrial bank, entered into an Accounts Receivable Purchase and Security Agreement (the "Agreement") effective November 10, 2008. Pursuant to the Agreement, TAB agreed to purchase from Arrow accounts receivable owed by third parties to Arrow. In the summer of 2009, TAB began to discover irregularities in the account documents Arrow submitted and discrepancies between invoices provided to TAB and amounts remitted by Arrow customers. An investigation ensued. On December 11, 2009, Arrow admitted to TAB that it had been providing TAB with fraudulent invoices. Arrow also informed TAB that, in order to stay in business, it needed a cash infusion of $749,000 in order to meet payroll and cover fuel costs. TAB agreed to make an emergency advance by purchasing additional invoices in that amount. Between December 14-18, 2009, TAB advanced an

additional $971,000 to cover driver payroll, fuel and other operating expenses.

In a conference call with TAB and other secured creditors on December 21, 2009, officers of Arrow disclosed that over the preceding year, Arrow had failed to pay payroll tax trust fund obligations in excess of $9 million. The same day, TAB advised Arrow that no further purchases of invoices would be made. On December 22, 2009, Arrow ceased operations and terminated its employees. The same day, TAB's remote connection to Arrow's accounts receivable computer was suddenly terminated, allegedly leaving TAB unable to respond to customer inquiries and continue collection of customer accounts.

On January 8, 2010, TAB filed this lawsuit, naming as defendants Arrow; affiliates Piel Corp., Megan Corp. and Arrow Truck Real Estate Co.; Carol Pielsticker (an owner and former Director and Chairman of the Board of Arrow); Doug Pielsticker (Arrow's former President, Chief Executive Officer and Director); Jonathan Moore (former Treasurer and Chief Financial Officer of Arrow); and Joseph Mowry (Arrow's former Secretary and General Counsel). TAB asserted sixteen claims for relief, including breach of the Agreement, breach of various guaranty agreements, fraud, conspiracy, RICO conspiracy, breach of fiduciary duty and fraudulent transfer. Carol Pielsticker was named in the Fourth Claim for Relief for breach of a guaranty agreement she is alleged to have signed December 11, 2009; the Twelfth Claim for Relief for breach of fiduciary duty and good faith; the Thirteenth Claim for Relief for breach of fiduciary duty to Arrow's creditors; the Fourteenth Claim for Relief for fraudulent transfer; and the Sixteenth Claim for Relief for recovery of unlawful dividends.

Later that same day, January 8, 2010, Arrow filed for Chapter 7 bankruptcy protection in the United States Bankruptcy Court for the Northern District of Oklahoma (Case No.10-10041-

R).  Subsequently, the bankruptcy court substantively consolidated the Arrow affiliates Megan Corporation, Arrow Truck Real Estate Company and Arrow Truck Leasing Company into Arrow's Chapter 7 proceeding.

Carol Pielsticker ("Carol") seeks dismissal of the Twelfth, Thirteenth, Fourteenth and Sixteenth Claims for Relief.  She asserts that, as a result of the bankruptcy filing by Arrow, the claims are now the exclusive property of Arrow's bankruptcy estate, TAB lacks standing to assert them and therefore, this court lacks subject matter jurisdiction.  TAB concedes the fraudulent transfer claim should be dismissed, but contends it is entitled to pursue the breach of fiduciary duty and unlawful dividend claims.

## I.  Standard of Review

A Rule 12(b)(1) motion is appropriate where the standing of a plaintiff to assert a claim is challenged.  *See Colorado Environmental Coalition v. Wenker,* 353 F.3d 1221, 1227 (10th Cir. 2004).  "Article III of the United States Constitution restricts the judicial authority to deciding 'Cases' and 'Controversies'," and "[t]he case-or-controversy requirement is satisfied only where a plaintiff has standing."  *Protocols, LLC v. Leavitt,* 549 F.3d 1294, 1298 (10th Cir. 2008).  Whether a plaintiff has standing is a legal question.  *Lippoldt v. Cole,* 468 F.3d 1204, 1216 (10th Cir. 2006).  The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction.  *Montoya v. Chao,* 296 F.3d 952, 955 (10th Cir. 2002).

Rule 12(b)(1) motions may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests.  *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell,* 363 F.3d 1072, 1074 (10th Cir. 2004).

Here, defendant has appended to her motion filings in the United States Bankruptcy Court for the

Northern District of Oklahoma. When a defendant challenges the facts upon which subject

matter jurisdiction depends, the court must look beyond the complaint and has wide discretion to

allow documentary evidence without converting the motion into a Rule 12(b)(6) or Rule 56

motion. *Paper, Allied-Industrial, Chemical & Energy Workers Int'l Union v. Continental

Carbon Co.,* 428 F.3d 1285, 1292 (10th Cir. 2005). The court takes judicial notice of the

bankruptcy court filings.

## II. Allegations of Complaint

TAB is a Utah industrial bank with its principal place of business in Ogden, Utah. [Doc.

No. 2, Complaint, ¶1]. Arrow is an Oklahoma corporation with its principal place of business in

Tulsa. [*Id.,* ¶2]. Carol is an Oklahoma resident and a direct or indirect owner of Arrow Trucking

and was formerly a director and chairman of Arrow. [*Id.,* ¶6]. TAB and Arrow entered into an

Accounts Receivable Purchase and Security Agreement (the "Agreement") effective as of

November 10, 2008. [*Id.,* ¶13]. Pursuant to the Agreement, TAB agreed to purchase from

Arrow certain accounts receivable owed to Arrow by third parties. [*Id.,* ¶14]. TAB and Arrow

entered into an Addendum to the Agreement, also effective as of November 10, 2008. [*Id.,* ¶17].

Under the terms of the Agreement and Addendum, Arrow warranted, among other things: that

each account receivable was a bona fide obligation of the account debtor for the face amount of

the invoice evidencing the account receivable; that before it submitted the account receivable to

TAB, it would ensure that there were "no defenses or setoffs to payment of the account which

could be asserted by way of defense or counterclaim against Arrow or TAB"; and that there

would be no extensions, modifications or other agreements relating to the payment of such

accounts except as shown on the face of the invoice. [*Id.,* ¶18]. Doug Pielsticker, as President and CEO of Arrow, signed the Agreement and the Addendum. [*Id.,* ¶19].

Some or all of the representations made by Arrow were false at the time they were made and, "[u]pon information and belief," the financial statements presented to TAB by Arrow were materially inaccurate and false. [*Id.,* ¶¶20-21]. "Upon information and belief," Arrow was insolvent or on the verge of being insolvent at the time the Agreement and Addendum were signed. [*Id.,* ¶22].

As originally intended and implemented, Arrow presented invoices to TAB with the letter "A" at the end of a six-digit invoice number. If Arrow needed to make an adjustment to an invoice, it created a second invoice with the same six-digit number, but containing the letter "B" at the end of the number. In such circumstances, TAB alleges, the Arrow customer was supposed to pay both the "A" and the "B" invoices. [*Id.,* ¶27]. Beginning in July 2009, TAB noticed some irregularities in the documents Arrow submitted in support of its requests for payment. TAB also began to notice that some customers were remitting an amount less than the amount shown on the "A" invoices submitted by Arrow to TAB. [*Id.,* ¶28]. In a conference call between TAB and Moore about the irregularities, Moore assured TAB that the "A" invoices were legitimate. [*Id.,* ¶29]. On or about September 1, 2009, TAB's A/R Financing Manager made a personal call on Arrow at its office in Tulsa to discuss invoice-billing discrepancies identified through account monitoring activities. During the meeting, Moore and Mowry represented that a number of billing errors were made by a billing clerk which resulted in approximately $1.9 million in "over-billed receivables" being sent to TAB for funding. They further represented that the billing clerk had been terminated, the problem was rectified, and new

system controls were put into place to prevent future problems. [*Id.,* ¶31]. Arrow agreed to pay the over-billed amount back to TAB over a period of 20 business days. [*Id.*]. On September 3, 2009, TAB sent a notice of default to Arrow, and on September 14, 2009, Arrow sent a response to TAB claiming the default had been cured. [*Id.,* ¶¶32-33]. The representations contained in the response were false when made and intended by Moore and Mowry to conceal and further the fraud being committed. [*Id.,* ¶33].

On September 15, 2009, TAB's A/R Financing Manager made another on-site visit to Arrow with the intent of calling Arrow's customers to verify A/R balances. Prior to the visit, Mowry had arranged with TAB's president to only call certain accounts and to place all calls through Moore. Throughout the day, TAB's A/R Manager and Moore placed calls to approximately 30 persons represented to be Arrow customers. The customer phone numbers were pulled directly from Arrow's computer system and all of the phone numbers were unique. [*Id.,* ¶34]. During the phone calls, the alleged "customers" fielding the calls confirmed the Arrow A/R balances. TAB later learned that the phone calls were made to Arrow accomplices purporting to be Arrow customers, and that the accomplices had responded falsely to the inquiries. [*Id.,* ¶35]. Between August and December 2009, TAB's on-going concerns with the Arrow relationship led to a number of conference calls and emails between TAB and Arrow. The conference calls included Moore and Mowry. TAB identified concerns based upon troubling account trends including poor invoice aging, a high dilution percentage, significant differences between purchases and collections and many "short-paid" receivables. During the phone calls and emails, Arrow continued to conceal the fraudulent activity, including representations that Arrow's poor account trends were the result of a significant increase in

revenue stemming from a longer average length of haul. [*Id.,* ¶36].

During November 2009, Arrow was approaching the credit limit of $28 million that had been established for the A/R Account.  TAB informed Arrow that no funding would occur beyond this credit limit. [*Id.,* ¶37].  Despite the economic problems facing Arrow during the fall of 2009, Arrow records indicate that large checks payable to defendants continued to be issued, including checks to Carol for $50,000 on August 17, 2009, and $50,000 on September 10, 2009. [*Id.,* ¶38].

On November 23, 2009, Moore and Mowry flew to Utah to meet with TAB and, during the meeting, provided TAB with Arrow financial statements, operational metrics and other commentary that purportedly supported Arrow's recent growth.  The written and oral information communicated by them in the meeting was materially and knowingly false and inaccurate, and was given in furtherance of the fraud being committed against TAB. [*Id.,* ¶39].

On the morning of Friday, December 11, 2009, TAB again demanded to verify the accounts receivable data provided by Arrow.  Moore provided information to TAB that he claimed to be contact information for several of Arrow's customers and third party payors. When TAB contacted these parties, it learned these persons were not actually affiliated with payors and that in some cases, the payors did not exist. [*Id.,* ¶40].   In the early afternoon of December 11, 2009, TAB conducted a conference call with Mowry, advising him that TAB suspected Arrow had been submitting fraudulent invoices.  Mowry denied any knowledge of fraudulent invoicing, but told TAB he would personally investigate the issue.  Later the same day, Mowry admitted that Arrow had been providing TAB with fraudulent invoices, but that the sole person responsible for the activity was Moore, and Arrow had terminated Moore's

employment. [*Id.* ¶42]. Late in the day on December 11, 2009, after Mowry admitted the fraud, he told TAB that, in order for Arrow to stay in business and make TAB whole for its losses, Arrow needed $414,000 to meet payroll and $335,000 to cover fuel for a total cash infusion of $749,000. In response to this request and in order to avoid a shutdown of Arrow's operations, TAB agreed to make an "emergency advance" by purchasing additional invoices in the amount of $749,000, and immediately transferred that amount to Arrow. [*Id.,* ¶43]. As additional consideration for TAB's willingness to make the emergency advance to Arrow on December 11, 2009, Doug Pielsticker, Carol Pielsticker and Megan Corp. each guaranteed full repayment of the $749,000 advance. [*Id.,* ¶44].

On December 14, 2009, TAB sent representatives to Arrow to determine the outstanding amount of fraudulent invoices and to determine the manner in which the fraud had been perpetrated. [*Id.,* ¶45]. Arrow employees advised TAB that Arrow management would determine the amount of cash needed that day to cover the operational shortfall and would then order creation of "A" invoices to be submitted to TAB in the amount necessary to cover the shortfall. After the "A" invoices had been sold to Tab for a deliberately overstated amount, the invoices would then be rebilled as "B" invoices and the "B" invoices would be sent to the customers at the correct and much smaller amounts. [*Id.*]. The employees admitted that various management employees were involved in directing and manipulating the overstated invoices sold to TAB. [*Id.*].

Between December 14 and December 18, 2009, TAB advanced approximately $543,000 to Arrow to cover fuel and other operating expenses, including driver payroll. [*Id.,* ¶47]. On December 18, 2009, it made another emergency advance of $428,000 for driver payroll, and

advanced to or otherwise authorized an affiliate to continue to sell fuel to Arrow so its drivers would not be stranded and could return home. [*Id.,* ¶48]. By December 21, 2009, Arrow had exceeded its credit limit with TAB. [*Id.,* ¶55]. During a conference call that morning among Arrow, TAB and other Arrow secured creditors, officers of Arrow disclosed that over the past year, Arrow failed to pay certain payroll tax fund obligations as required by applicable federal and state revenue laws. Arrow had appropriated or its own use in excess of $9 million of withheld federal income trust fund taxes and both employee and employer shares of Social Security and Medicare taxes. [*Id.,* ¶56]. At noon on December 21, 2009, TAB advised Arrow that no further purchases of invoices would be made. [*Id.,* ¶57]. On December 22, 2009, Arrow ceased operations and terminated its employees. The same day, TAB's remote connection to Arrow's accounts receivable computer was suddenly terminated, allegedly leaving TAB unable to respond to customer inquiries and continue collection of the customer accounts. [*Id.,* ¶58]. Arrow has submitted thousands of fraudulent invoice reports to TAB totaling over $27 million. Of this amount, TAB believes it has paid Arrow more than $12.5 million in inflated invoices. [*Id.,* ¶62].

During 2009, Carol received money, property and things of value from Arrow, including but not limited to payments that at times averaged approximately $10,000 per week. [*Id.,* ¶64].

**Twelfth Claim for Relief**
**(Breach of Fiduciary Duty and Good Faith)**

Carol Pielsticker, Doug Pielsticker, Jonathon Moore and Joseph Mowry were officers and directors of Arrow and TAB is a creditor of Arrow. [*Id.,* ¶¶127-128]. The directors and officers of Arrow each had a fiduciary duty of care, fiduciary duty of good faith, and a fiduciary duty of loyalty to the shareholders of Arrow. [*Id.,* ¶129]. When Arrow became insolvent or was

becoming insolvent, the directors and officers owed fiduciary duties to the creditors of Arrow, including TAB. [*Id.,* ¶130]. The directors and officers breached their fiduciary duties to TAB. [*Id.*]. As a result, TAB has suffered damages of not less than $12.5 million. [*Id.,* ¶132].

### Thirteenth Claim for Relief
### (Breach of Fiduciary Duty to Arrow's Creditors)

"With respect to this claim for relief alone, TAB brings this claim derivatively in the right and for the benefit of Arrow Trucking to redress injuries suffered by Arrow Trucking and its creditors, as a direct result of breaches of fiduciary duties by Arrow Trucking's officers and directors. With respect to this claim for relief alone, Arrow Trucking is named as a nominal defendant solely in a derivative capacity." [*Id.,* ¶134]. TAB will fairly represent the interests of Arrow in enforcing and prosecuting its rights. The directors and officers of Arrow each had a fiduciary duty of care, a fiduciary duty of good faith, and a fiduciary duty of loyalty to the shareholders of Arrow. [*Id.,* ¶138]. When Arrow became insolvent or was becoming insolvent, the officers and directors owed fiduciary duties to the creditors of Arrow, including TAB. [*Id.,* ¶139]. The directors and officer breached their fiduciary duties to TAB, and as a result of these breaches, the creditors of Arrow have suffered damages.[*Id.,* ¶¶140-141].

### Fourteenth Claim for Relief
### (Fraudulent Transfers)

Arrow has, "over the past year," made substantial financial transfers to Carol Pielsticker and Doug Pielsticker, directly or to others for their benefit. [*Id.,* ¶142]. The transfers were made with the actual intent to hinder, delay or defraud TAB and other creditors. [*Id.,* ¶143]. Arrow did not receive consideration for the transfers or did not receive consideration of a reasonably equivalent value in exchange for the transfers. [*Id.,* ¶144]. At the time of the transfers, Arrow

had or intended to incur debts beyond its ability to pay as they became due or, in the alternative, Arrow was engaged in business activities or transactions for which its remaining assets were unreasonably small in relation to the business activities or transactions. [*Id.*, ¶145]. "On information and belief," Arrow was insolvent at the time the transfers were made or became insolvent as a result of the transfers. [*Id.*, ¶146]. As a result of the transfers, TAB has been damaged and is entitled to recover the value of the transfers. [*Id.*, ¶147].

**Sixteenth Claim for Relief**
**(Recovery of Unlawful Dividends)**

As directors of Arrow, Carol Pielsticker and Doug Pielsticker are liable under the Oklahoma General Corporations Act for repayment of the Transfers made during 2009 because the transfers were negligently or willfully authorized and paid while Arrow was insolvent, and at times when it had no surplus or net profits or when Arrow had negative capital as defined by 18 O.S. §1049. [*Id.*, ¶¶151-155]. Arrow is insolvent and TAB has been damaged in the full amount of all unlawful dividends, including but not limited to the transfers to the Pielstickers. [*Id.*, ¶¶156, 158].

**III. Bankruptcy Filings**

Arrow filed for Chapter 7 bankruptcy protection on January 8, 2010, in the United States Bankruptcy Court for the Northern District of Oklahoma, Case No. 10-10041-4 [Doc. No. 1]. Patrick J. Malloy was appointed Trustee of the estate. [Doc. No. 8]. Subsequently, the bankruptcy court substantively consolidated Arrow affiliates Megan Corporation [Doc. No. 315], Arrow Truck Real Estate Company [Doc. No. 565] and Arrow Truck Leasing Company [Doc. No. 562] into Arrow's Chapter 7 proceeding.

**IV. Analysis**

11

Carol asserts the court lacks subject matter jurisdiction of TAB's claims for breach of fiduciary duty, breach of fiduciary duty to creditors, fraudulent transfer, and payment of unlawful dividends because the claims are derivative in nature and belong exclusively to Arrow. Carol maintains that, when Arrow filed bankruptcy, the derivative claims became the property of the bankruptcy estate, and only the trustee has the right to assert the claims. Thus, she argues, TAB lacks standing to pursue the claims. TAB contends, however, that the claims are not derivative in nature, that it has a personal right as a creditor to bring them, and that, consequently, Arrow's bankruptcy filing did not divest this court of jurisdiction.

## A. Governing Law

The first step in determining whether TAB has standing to bring the claims at issue is to determine which state's law governs these particular derivative claims against Carol. To resolve this question, the court must apply the choice of law rules of the state in which the district court sits. *Anderson v. Commerce Construction Services, Inc.* 531 F.3d 1190, 1193 (10th Cir.2008) (citing *Mem'l Hosp. Of Laramie County v. Healthcare Realty Trust, Inc.,* 509 F.3d 1225, 1229 (10th Cir. 2007)) and *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496 (1941)). Thus, the court looks to Oklahoma's choice of law provision.

Oklahoma follows the Restatement (Second) of Conflict of Laws. *Ysbrand v. DaimlerChrysler Corp.,* 81 P.3d 618, 625 (Okla. 2003). Section 302 of the Restatement provides that the law of the state of incorporation shall be applied to determine issues involving the rights and liabilities of a corporation, unless it is shown that some other state has a more significant relationship to the occurrence and the parties. *Wachsler, Inc. v. Florafax,*

*International, Inc.,* 778 F.2d 547, 550 (10th Cir. 1985).[1]  Similarly, §306 of the Restatement

provides that the obligations owed by a majority shareholder to the corporation and to minority

shareholders will be determined by the local law of the state of incorporation "except, in the

unusual case where, with respect to the particular issue, some other state has a more significant

relationship under the principles stated in §6 to the parties and the corporation, in which event

the local law of the other state will be applied." Restatement (Second) of Conflicts of Law §306.[2]

Thus, "'[t]he Restatement drafters no doubt viewed the state of incorporation as a 'most

significant contact' in the resolution of a fiduciary obligation dispute." *Panama Process, S.A. v.

Cities Serv. Co.,* 796 P.2d 276, 289 (Okla. 1990).  Since Arrow is an Oklahoma corporation, it

would be appropriate under both §302 and §306 to apply the substantive law of Oklahoma to the

---

[1]§302 of the Restatement (Second) of Conflict of Laws provides:

(1) Issues involving the rights and liabilities of a corporation, other than those
dealt with in §301, are determined by the local law of the state which, with
respect to the particular issue, has the most significant relationship to the
occurrence and the parties under the principles stated in §6.

(2) The local law of the state of incorporation will be applied to determine
such issues, except in the unusual case where, with respect to the particular
issue, some other state has a more significant relationship to the occurrence
and the parties, in which event the local law of the other state will be applied.

Comment a. to §302 explains that the rule applies not only to matters which involve a
corporation's relationship to its shareholders, but also to matters which affect the interests of the
corporation's creditors, including the declaration and payment of dividends.  Restatement
(Second) Conflict of Laws, §302(a) cmt.

[2]The factors listed in §6 are: "(a) the needs of the interstate and international systems, (b)
the relevant policies of the forum, (c) the relevant policies of other interested states and the
relative interests of those states in the determination of the particular issues (d) the protection of
justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty,
predictability and uniformity of result, and (g) ease in the determination and application of the
law to be applied." Restatement (Second) Conflict of Laws, §6.

breach of fiduciary duty and recovery of unlawful dividend claims against Carol.

TAB argues, however, that since the Agreement (which Carol did not sign), as well as the Carol Pielsticker Guaranty, contain forum selection clauses designating Utah law, the court should apply the substantive law of Utah to the derivative claims.

The choice of law provision in the Agreement states, in pertinent part, "This Agreement and all transactions or disputes arising directly or indirectly hereunder shall be governed by, construed under and enforced in accordance with the internal laws of the State of Utah." [Doc. No. 2-2, Ex. 1 to Complaint, ¶22]. Although Carol is not a party to the Agreement and did not sign it on behalf of Arrow, TAB asserts she is a "closely related third party " and therefore should be bound by the provisions of the contract, including the choice of law provision. The "closely related" doctrine binds nonsignatory parties to the forum or venue selection clause of a contract where it was foreseeable, based on their involvement in or proximity to the transaction, that the clause might have application to disputes arising under the agreement that also involved that party. *See Firefly Equities, LLC v. Ultimate Combustion Co.,* 2010 WL 3517396 (S.D.N.Y. Sept. 10, 2010). The cases TAB cites to support this proposition, however, all involve situations in which the third party was a beneficiary of the contract and/or had personally negotiated it on behalf of the corporation.[3] In this case, TAB does not allege Carol signed the Agreement or

_____

[3]For example, in *Firefly Equities*, the court enforced a forum selection provision in a contract between Firefly Equities, LLC and Ultimate Combustion Co. against Ultimate's president, Staroselsky, who had negotiated the contract and signed it on behalf of Ultimate, on the basis of the "closely related doctrine." The court stated, "Based on the fact that Staroselsky himself signed the MOU (albeit in his representative rather than individual capacity), it was–or should have been–foreseeable to him that the clause might have application to disputes arising under the agreement that also involved him." *Id.* *3. In *Rayonier Wood Prods., L.L.C. v. Scanware, Inc.,* 420 B.R. 915, 921-22 (S.D. Ga. 2009)*, the court applied the "closely related" doctrine to find that a choice of law provision by one entity could bind a nonsignatory entity

participated in its negotiation.  She is not alleged to have participated in performance of the

agreements or the activities involving fraudulent invoices.  Her only alleged connection is as a

passive owner and director of Arrow.  The court finds that this does not suffice to warrant

application of the "closely related" doctrine as to the Agreement.

The choice of law provision in the Limited Continuing Guaranty and Waiver states: "This

Guaranty and all acts and transactions hereunder and all rights of the parties hereto shall be

governed as to their validity, interpretation, construction, effect and in all respects by the laws of

the State of Utah." [Doc. No.2-2, Ex.7, ¶13].  This language is notably more narrow than the

---

where the two were alter-egos.  *Keenan v. GAP Exploration, Ltd.,* 2010 WL 1330334 (N.D.
Okla. Mar. 29, 2010), involved a dispute over ownership of interests in GAP.  Keenan and GAP
were parties to a consulting agreement with a forum selection clause designating Florida as the
sole venue for "any and all disputes arising under this agreement."  The agreement required
Keenan to devote his full time exclusively to the business activities of GAP and prohibited him
from competing with GAP.   The agreement also required Keenan to return any property of GAP
upon termination of the agreement.  Keenan alleged in his lawsuit that he was involved in a
separate partnership with GAP wherein he owned 50 percent of various oil and gas interests with
GAP and that interest was the subject of his lawsuit.  Therefore, he argued the forum selection
provision of the consulting agreement did not apply to his suit.   Defendants asserted the separate
partnership agreement violated the terms of the consulting agreement and presented evidence
establishing that Keenan's salary under the consulting agreement and the money he received in
conjunction with his other oil and gas dealings with GAP were "one and the same."  Thus, the
court concluded the forum selection provision of the consulting agreement should be applied to
require Keenan to pursue his claim in Florida.  Finally, in *Manetti-Farrow, Inc. v. Gucci Am.,
Inc.,* 858 F.2d 509, 513-15 (9th Cir.1998), plaintiff entered into an exclusive dealership contract
with Gucci Parfums, which designated Florence, Italy, as the forum for resolution of any
controversy "regarding interpretation or fulfillment" of the contract.  *Id.* at 510.  A dispute
between the parties arose.  Gucci terminated the exclusive dealership and brought suit against
Manetti-Farrow in Florence for breach of contract.  *Id.*  at 511.  One month later, Manetti-Farrow
sued Gucci and certain of its officers and directors in the Northern District of California,
asserting claims of conspiracy and tortious interference with contractual relations and with
prospective economic advantage.  *Id.*  The court, without commenting on whether the forum
selection clause was applicable to claims against the directors and officers, held that the clause
was worded broadly enough to cover not only contract claims but also the tort claims because
resolution of the tort claims required interpretation of the contract.  *Id.* at 514.

choice of forum clause in the Agreement and is limited to the "Guaranty and all acts and transactions hereunder."  This language cannot be reasonably interpreted to cover TAB's breach of  fiduciary duty and unlawful dividend claims against Carol.

TAB also argues the forum selection clauses in the Agreement and the Guaranty  should apply because they gave rise to a fiduciary duty on Carol's part toward TAB.  However, TAB has not identified, and the court cannot find, any language in either the Agreement or the Guaranty imposing a fiduciary duty on Carol.  Indeed, Claims 13 and 14 allege her fiduciary duty to creditors (including TAB) arose when Arrow became or was becoming insolvent.

The court concludes that the choice of law provisions in the Agreement and Guaranty do not apply to the claims for breach of fiduciary duty, fraudulent transfer and recovery of unlawful dividends against Carol.  Rather, applying the principles set out in §302 and §306 of the Restatement, the court finds that Oklahoma law applies to the substantive claims at issue, because Oklahoma was Arrow's state of incorporation.

## B.  Fiduciary Duty Claims (Twelfth and Thirteenth Claims)

Under Oklahoma law, an action for breach of fiduciary duty against a corporate director "belongs to the corporation alone, not to the corporation's creditors." *Fed. Deposit Ins. Corp. v. Grant,* 8 F.Supp.2d 1275, 1297 (N.D. Okla. 1998) (citing *Resolution Trust Corporation v. Greer,* 911 P.2d 257, 264-65 Okla. 1995). The Tenth Circuit has stated:

> As a general rule, and outside the context of a bankruptcy case, the fiduciary obligation of officers, directors, and shareholders is enforceable directly by the corporation or through a stockholder's derivative action.  However, "it is, in the event of bankruptcy of the corporation, enforceable by the trustee.  For that standard of fiduciary obligation is designed for the protection of the entire community of interests in the corporation-creditors as well as stockholders."

*Delgado Oil Co., Inc. v. Torres,* 785 F.2d 857, 860 (10th Cir. 1986) (quoting *Pepper v. Litton,*

308 U.S. 295, 306-307 (1939)).[4] Thus, Arrow's filed Chapter 7 filing divested TAB of any right

to pursue those claims.

TAB asserts that the breach of fiduciary duty and unlawful dividend claims are personal

and it should therefore be entitled to pursue them in this court. Neither federal law nor Utah law[5]

supports this assertion. In *Warner v. DMG Color, Inc.,* 20 P.3d 868 (Utah 2000), the court drew

a distinction between derivative and direct actions, stating:

> Derivative actions attempt to enforce rights belonging to a corporation. Claims of
> mismanagement, breach of fiduciary duties, and appropriation or waste of corporate
> opportunities are claims that the corporation has been injured. Accordingly, the
> cause of action belongs to the corporation and shareholders may sue only on its
> behalf. Even though shareholders may suffer indirect injuries due to fraudulent
> acts on the part of corporate officers, they generally do not have a direct cause of
> action for such injuries.

*Id.* at 872 (citations omitted). The court stated that direct actions, by contrast, require the

plaintiff to show that he or she was injured in a manner distinct from the corporation. *Id.* Thus,

in a direct action, a plaintiff as stockholder and an individual is injured, and the corporation is

not, "as where the action is based on a right belonging severally to [him or her], or on a fraud

---

[4]By statute, the bankruptcy court has "exclusive jurisdiction of all the property, wherever
located, of the debtor as of the commencement of [the] case, and of property of the estate." 28
U.S.C. §1334(e)(1). The filing of a bankruptcy petition creates an estate. 11 U.S.C. §541(a).
The estate includes all legal and equitable interests the debtor had in property as of the filing of
the bankruptcy petition. 11 U.S.C. §541(a)(1). The bankruptcy estate expansively includes all
kinds of tangible and intangible property, including causes of action. *ANR Ltd., Inc. v. Chattin,*
89 B.R. 898, 901 (D. Utah 1988).

[5]Although the court has determined that Oklahoma law applies to these derivative claims,
it addresses Utah law in the alternative, in the event it is ultimately determined that Utah law
applies.

affecting [him or her] directly." *Id.* (quotations and citations omitted). The court held plaintiff's allegations of conversion and misappropriation of corporate asserts were *not* direct claims because the complaint contained no allegations of harm specific to plaintiff, as opposed to harms affecting other shareholders or creditors fo the corporation. *Id.*

Similarly, in *ANR Ltd Inc. v. Chattin,* 89 B.R. 898, 900 (D. Utah 1988), the court distinguished between derivative claims and personal claims. There, the plaintiff creditor asserted claims against former officers and directors of a bankrupt corporation, seeking to hold them personally liable for mismanagement and misappropriation of funds based on theories of alter ego, breach of contract, breach of fiduciary duty, theft and conversion, fraudulent misrepresentation, constructive trust and violations of federal and state racketeering laws. Defendants challenged plaintiff's standing to assert the claims, arguing they were claims of the debtor's bankruptcy estate. Plaintiff contended the claims were personal claims. The court acknowledged that generally, under Utah law, a corporation is the proper party to assert claims against its insiders for corporate mismanagement, misappropriation of corporate assets and breach of fiduciary duty, and that when a corporation files bankruptcy, the trustee succeeds to such rights. *Id.* at 901. Nevertheless, the court stated, "[t]hese principles do not preclude actions against corporate insiders by creditors who have been specifically harmed by their wrongful conduct. Such 'personal claims' are not part of the bankruptcy estate." *Id.* at 902 . Citing *Koch Refining v. Farmers Union Central Exch., Inc.,* 831 F.2d 1339, 1348-50 (7th Cir. 1987), the court explained, "A cause of action is 'personal' if the claimant himself is harmed and no other claimant or creditor has an interest in the cause." *Id.* "To determine whether a particular cause

of action accrues specifically to a claimant or generally to the corporation, a court must decide whether the injury is peculiar and personal to the claimant or general and common to the corporation and other creditors." *Id.* at 902 (citing *Koch Refining,* 831 F.2d at 1349). The court held that while Utah law allows the remedy of alter ego to belong to either a debtor-corporation or to a creditor, "[t]he ultimate determination of whether this remedy is part of the debtor's estate depends on whether placing this right of action within the estate will further federal bankruptcy policies." *Id.* at 903. The court noted that since the Bankruptcy's Code's "ultimate goal is to balance the equities and interests of all affected parties involved in a bankruptcy case," it should be construed "so as to prevent one creditor from recovering a fund rightfully belonging to other creditors similarly situated." *Id.* The court concluded, "Because a successful alter ego action results in a finding that the defendants are personally liable for all corporate debts, the bankruptcy trustee is logically the proper party to bring an alter ego right of action in the first instance." *Id.* at 903-04.

In contrast, the court held that ANR's claims for theft, conversion and misrepresentation against corporate insiders involved allegations of direct injuries to ANR alone and no other creditors. *Id.* at 905. ANR had standing to pursue those claims because "it [was] possible for ANR to show that the defendants specifically directed certain episodes of theft, conversion and misrepresentation at ANR and thereby caused personal losses to ANR." *Id.*

Here, TAB has asserted personal claims against Arrow, its affiliates and certain of its directors and officers. Those claims are for fraud, conspiracy, RICO violations, RICO conspiracy and the Utah Pattern of Unlawful Activity law. The claims are based on the

allegations of fraudulent invoices Arrow presented to TAB.  TAB may be entitled to pursue

these personal claims against the companies in bankruptcy court and certain personal claims

against the directors and officers in this court.  However, the alleged breach of fiduciary duty by

Carol harmed not just Arrow, but all other creditors and stakeholders.  Therefore, the derivative

breach of fiduciary claims cannot be considered to be personal to TAB.

### C.  Fraudulent Transfer Claim (Fourteenth Claim)

TAB's fraudulent transfer claim is brought in accordance with the Uniform Fraudulent

Transfer Act, which Oklahoma has adopted.  *See* 24 O.S. §112 *et seq*.   As TAB concedes,

claims brought under this act must be pursued by the bankruptcy trustee.  *Farley v. Hill,* 2005

WL 1258922, at *1 (W.D. Okla. 2005) (citing *Delgado,* 785 F.2d at 860).  Therefore, TAB lacks

standing to bring the claim, this court does not have subject matter jurisdiction, and the claim

must be dismissed.

### D.  Unlawful Dividends

Construing corporation statutes with language nearly identical to Oklahoma's General

Corporation Act, courts have concluded that once bankruptcy ensues, a claim for unlawful

payments of dividends becomes the property of the bankruptcy estate under 11 U.S.C. §541.  *See*

*In re Musicland Holding Corp.,* 398 B.R. 761, 784 (Bankr. S.D.N.Y. 2008); *AT&T Corp. v.*

*Walker,* 2006 WL 2938783, at *3 (W.D. Wash. Sept. 11, 2006)**.**

The Tenth Circuit has held that "the bankruptcy court is the only court with

postbankruptcy subject matter jurisdiction over preferential transfers of the debtor's property."

*Delgado,* 785 F.2d at 860.   In accordance with *Delgado,* the court finds that any claim for

payment of unlawful dividends is the property of the bankruptcy trustee.  Therefore, TAB's

Sixteenth Claim for Relief must be dismissed.[6]

## V.  Request for Attorneys' Fees

Movant seeks an award of attorneys' fees incurred in connection with filing this motion.

Pursuant to 28 U.S.C. §1927, the court may award fees personally against "[a]ny attorney or

other person admitted to conduct cases in any court of the United States...who so multiplies the

proceedings in any case unreasonably and vexatiously."  The Tenth Circuit has found a §1927

award of fees and costs appropriate when an attorney "continued to assert claims...long after it

would have been reasonable and responsible to have dismissed the claims."  *Dreiling v. Peugeot*

*Motors of Am., Inc.,* 768 F.2d 1159, 1165 (10th Cir. 1985).[7]

Here, whether Oklahoma or Utah substantive law is applied, the law is well settled that,

once a bankruptcy is filed, derivative claims such as those for breach of fiduciary duty and

payment of unlawful dividends become the property of the estate and may be asserted only by

the trustee.  The Arrow bankruptcy was filed the same day as this lawsuit.  Thus, TAB's

attorneys were on notice from the day this suit was filed that it did not have standing to assert the

derivative claims.  Instead of dismissing the claims, counsel put defendant Carol Pielsticker

Bump to the trouble and expense of extensive motion practice and also required considerable

---

[6]As with the breach of fiduciary claims, even if the court were to apply Utah substantive law, it would conclude the claim for unlawful dividends is not personal to TAB.  *All* creditors were harmed by the alleged unlawful payments.  Therefore, once bankruptcy was filed, the claim became the property of the estate.

[7]Additionally, the court has the inherent authority to award fees and costs.  *Morganroth & Morganroth v. DeLorean,* 213 F.3d 1301, 1317 (10th Cir. 2000).

court time and attention.

Therefore, the court finds that Carol Pielsticker Bump is, upon application, entitled to recover costs and reasonable attorneys fees associated with the filing of her Motion to Dismiss.

## VI. Conclusion

Defendant Carol Pielsticker Bump's Motion to Dismiss Claims 12, 13, 14 and 16 for lack of Subject Matter Jurisdiction [Doc. No. 82] is granted.

ENTERED this 21st day of January, 2011.


Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma